IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| QUENTIN M. FREDRICKSON, | ) | 8:10CV280 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | MEMORANDUM |
| | ) | AND ORDER |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Quentin Fredrickson, brings this suit challenging the Social Security Commissioner's final administrative decision denying his applications for disability insurance benefits and supplemental security income payments under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401 et seq.,1381 et seq.[1]  For the reasons discussed below, the Commissioner's decision will be affirmed.

## I.  BACKGROUND

Plaintiff claims disability based on bipolar disorder and other impairments.  He first applied for benefits on September 19, 2005 (Tr. 54, 410). After his applications were denied, Plaintiff appealed to an administrative law judge ("ALJ") (Tr. 86, 109).

The ALJ held an administrative hearing on June 11, 2008 (Tr. 403–62), and issued an adverse decision on August 8, 2008 (Tr. 19–29). In the decision, the ALJ found that Plaintiff's impairments limited him to work that did not involve interaction with the public, close proximity to others, or noisy environments. The ALJ did not

---

[1] Sections 205(g) and 1631(c)(3) of the Act, 42 U.S.C. §§ 405(g), 1383(c)(3), provide for judicial review of the Commissioner's final administrative decisions under Titles II and XVI.

credit Plaintiff's testimony that he frequently is bedridden because of depression. Although finding that Plaintiff was unable to return to his past relevant work as a car detailer, customer service caller, and order filler,[2] the ALJ found that Plaintiff could perform other jobs, such as packager, final assembler, and inspector tester.

Plaintiff requested a review of the ALJ's decision by the Appeals Council and submitted additional evidence, including a psychiatric evaluation report by Terry A. Davis, M.D., J.D. (Tr. 55-74, 370), and a letter from Todd Stull, M.D. (Tr. 371). The Appeals Council denied Plaintiff's request for review on May 27, 2010 (Tr. 4). This court action was brought on July 28, 2010.

### A.  The ALJ's Findings

The ALJ evaluated Plaintiff's claim according to the 5-step sequential analysis prescribed by the Social Security Regulations[3] and made these findings:

---

[2] The car detailer and order filler jobs were eliminated because of exertional limitations, while the customer service caller position was eliminated because of Plaintiff's inability to interact with the public.  (Tr. 457)

[3]     The sequential evaluation process is a series of five "steps" that we follow in a set order. If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step. If we cannot find that you are disabled or not disabled at a step, we go on to the next step. Before we go from step three to step four, we assess your residual functional capacity. . . . We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps. These are the five steps we follow:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable

1. The claimant met the insured status requirements of the Social Security Act through September 30, 2006.

2. The claimant has not engaged in substantial gainful activity since July 15, 2003, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*). The claimant's earnings have not been at substantial gainful activity levels since his alleged onset date.

3. As of July 15, 2003, the claimant had the following severe impairments: Bipolar disorder; panic disorder with agoraphobia; and obesity (20 CFR 404.1520(c) and 416.920(c)). The claimant has a history of substance use disorder.

On December 2, 2007, the claimant developed back and right lower leg symptoms that led to right-sided L4 hemilaminotomy, foraminotomy, and removal of an L4-5 disk fragment on March 25, 2008.

---

physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. . . .

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that, until December 2, 2007 the claimant's residual functional capacity for work at all exertional levels was limited as follows:

The claimant has no limitation in the areas of understanding, remembering, and carrying out short simple instructions or in the area of complex instructions, although he has intrusive thoughts that would affect concentration. There is no limitation on making judgments on simple work-related decision, except with regard to his ability to focus. There is marked limitation on his ability to interact with the public. If he were in a work situation and were approached by a member of the public, he might freeze up, and this symptom may become extreme. Generally, the limitation would be marked, with the claimant unable to respond or interact with the general public. The claimant would be unable to work in a noisy environment, such as one with general conversation in close proximity; one with constant ringing telephones and rustling of papers; or one in close proximity to other people in a cubicle situation. However, if the distance exceeded two or three yards, the claimant could function. The same limitation would apply to supervisors.

In responding appropriately to usual work situations or changes in a routine work setting, (for example, if the claimant were accustomed to working at one given work station and then was required to move to a different work station, with the presence of unfamiliar people), it would take the claimant five minutes to stop, assess, and adjust to the new situation. He then could function. Other situations include a change in job tasks; for example, if he were placing items in a box and that changed, he would hesitate. If it were a major change in job tasks, for example, if he were doing piece work and was given new equipment to use, he would require five minutes to adjust and then could function. If he took a different route to work, that would cause hesitation.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on August 30, 1973 and was 29 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 15, 2003 through the date of this decision (20 CFR 404.1520(g) and 416.920(g) ).

(Tr. 21-28)

## B. Statement of Issues

Issues raised by Plaintiff are (1) whether the ALJ and the Appeals Council properly weighed the opinions of medical sources, (2) whether the ALJ properly found that the severity of Plaintiff's impairments did not meet a listing, (3) whether the ALJ properly assessed Plaintiff's credibility and his residual functional capacity ("RFC"), and (4) whether the ALJ properly determined at step five of the evaluation process that Plaintiff is not disabled.

### C. Statement of Facts

Plaintiff alleges that he became disabled on July 15, 2003 (Tr. 411-12). Plaintiff earned a General Equivalency Degree and, immediately before the alleged onset of disability, worked as a car detailer (Tr. 124, 411). He stands 6'1" tall, weighs about 300 pounds, and was 34 years old on the date of the ALJ's decision (Tr. 411, 418).

On June 24, 2005, about two years after his alleged disability began, Plaintiff presented to John Russell, PA-C, a physician's assistant, for a psychiatry consultation (Tr. 216). Plaintiff complained of mood swings and poor concentration (Tr. 216). He also reported using methamphetamine in the past (Tr. 216). Mr. Russell observed that Plaintiff had normal speech flow and tone, a mildly to moderately depressed mood, and non-delusional thought content (Tr. 217). Mr. Russell also noted that Plaintiff described attention difficulties, although none were detectable on examination (Tr. 217). Upon examination, Mr. Russell found that Plaintiff had "primarily intact" concentration and "good" memory, insight, and judgment (Tr. 217). Mr. Russell diagnosed panic disorder with agoraphobia (Tr. 217). He assigned Plaintiff a Global Assessment of Functioning (GAF) score of 65 to 70,[4] and prescribed an antidepressant (Tr. 217–18).

During a second appointment on July 12, 2005, Plaintiff reported mild improvement in symptoms (Tr. 215). Mr. Russell observed that Plaintiff had a "[m]ildly depressed" mood, linear thoughts, nondelusional thought content, good

---

[4] The *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision (*DSM-IV-TR*) states that the GAF scale is used to report the clinician's opinion as to an individual's level of functioning with regard to psychological, social, and occupational functioning. *See DSM-IV-TR* 32 (4th ed. 2000). A GAF score of 61 to 70 indicates the patient has some mild symptoms or some difficult in social, occupational, or social functioning, but is generally functioning pretty well and has some meaningful interpersonal relationships. *See id.* at 34.

insight and judgment, and intact attention and concentration (Tr. 215). He increased Plaintiff's medication, and prescribed a new antidepressant to aid sleep (Tr. 215).

Plaintiff reported dramatic improvement during an August 17, 2005 session (Tr. 213). However, he claimed he stopped taking the new medication due to side effects (Tr. 213). Plaintiff told Mr. Russell that he worked out regularly and went out with his aunt almost every day (Tr. 213). Mr. Russell observed that Plaintiff had a normal mood, linear thoughts, and "shows excellent insight and judgment today" (Tr. 213).

On September 20, 2005, Plaintiff told Mr. Russell that he had trouble controlling his anger at times, and had yelled at a woman who ran into him with her shopping cart (Tr. 211). Mr. Russell observed that Plaintiff had a mildly to moderately dysphoric mood, linear thoughts, "excellent" insight and judgment, and mild to moderate impulsivity (Tr. 211). Mr. Russell prescribed a different antidepressant (Tr. 211).

The following week, Plaintiff informed Mr. Russell that he felt manic on his new medication, and had stopped taking it (Tr. 209). He complained of severe depression (Tr. 209). Mr. Russell observed that Plaintiff behaved "a bit" erratically and had "mildly delusional" thought content, a manic mood, an irritated affect, and fair insight and judgment (Tr. 209). Mr. Russell prescribed new mood medications (Tr. 209).

On October 5, 2005, Mr. Russell noted that Plaintiff had superficial cuts on his forearms (Tr. 207). Upon examination, Plaintiff had a depressed mood, a somewhat agitated affect, limited insight and judgment, and moderate impulsivity (Tr. 207). Mr. Russell noted that Plaintiff denied psychosis, but seemed "to have odd perceptions at

times" (Tr. 207). He assigned a GAF score of 55,[5] and increased Plaintiff's medications (Tr. 207).

Plaintiff reported some improvement during the next week's examination (Tr. 205). Mr. Russell noted that Plaintiff was hypo-manic at times, and dysphoric at others (Tr. 205). He noted that Plaintiff had not had further issues with self-harm, and exhibited fair judgment, good insight, and moderate impulsivity (Tr. 205). Mr. Russell elevated Plaintiff's GAF score to 60 (Tr. 205).

During an appointment about one week later, Plaintiff told Mr. Russell that he stopped taking one medication because he felt sedated (Tr. 203). He also revealed that he had applied for a warehouse job (Tr. 203). Mr. Russell observed that Plaintiff had a normal mood, good insight, and intact judgment (Tr. 203). Mr. Russell adjusted Plaintiff's medication (Tr. 203).

On November 2, 2005, Plaintiff informed Mr. Russell that he was sleeping better, but had poor concentration (Tr. 201). Mr. Russell observed that Plaintiff had good insight, intact judgment, and moderate impulsivity (Tr. 201). He assigned a GAF score of 60 to 65 and increased Plaintiff's medication (Tr. 201).

Christopher Milne. Ph.D., a state agency psychologist, completed a "psychiatric review technique" form based on the medical record on November 8, 2005 (Tr. 171–84). In the form, Dr. Milne indicated that Plaintiff suffered from bipolar disorder and panic disorder with agoraphobia, which caused moderate limitations in the areas of social functioning and preservation of concentration, persistence, or pace, but which caused no extended episodes of decompensation (Tr. 174, 176, 181). In a residual-functional-capacity assessment issued that day, Dr. Milne noted that Plaintiff was moderately limited at understanding, remembering, and carrying out detailed

_____

[5] A GAF score of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See DSM-IV-TR* 34 (4th ed. 2000).

instructions; maintaining attention and concentration for extended periods; completing a normal workweek without interruption; interacting with the public, supervisors, and coworkers; responding appropriately to changes in work setting; and setting realistic goals (Tr. 185–86).[6]

On December 12, 2005, Plaintiff informed Mr. Russell that he started working at a warehouse, but felt anxious there (Tr. 200). Mr. Russell observed that Plaintiff had an anxious mood, good insight, fair judgment, and moderate impulsivity (Tr. 200). He prescribed a new mood medication (Tr. 200).

During a December 27, 2005 examination, Plaintiff told Mr. Russell that he lost his job and was not doing well (Tr. 198). Mr. Russell observed that Plaintiff made good eye contact, was calm and pleasant, appeared mildly delusional, and had fair insight and judgment and moderate impulsivity (Tr. 198). Mr. Russell prescribed a trial of anti-psychotic medication (Tr. 198).

Plaintiff reported feeling somewhat better during his next appointment on January 11, 2006 (Tr. 196). He claimed that current medication allowed him to sleep at night (Tr. 196). Mr. Russell observed that Plaintiff was cooperative and pleasant, and had circumferential thoughts, fair insight and judgment, and moderate impulsivity (Tr. 196). Mr. Russell started Plaintiff on a low dosage of an antidepressant he had

---

[6] The "functional capacity assessment" portion of the form, in which the psychologist was instructed to "[e]xplain your summary conclusions in narrative form" and to "[b]e especially careful to explain conclusions that differ from those of treating medical sources or from the individual's allegations" (Tr. 187) was left blank. Dr. Milne's only explanatory comments are found in the "consultant's notes" section of the form, in which it was noted, in addition to providing a summary of Mr. Russell's progress notes, that Plaintiff "indicated that he had been unable to work for 2 yrs but had not sought [treatment]" and that he "attend[s] church regularly and spends time with one aunt, so he is likely not as isolating as he alleges. (Tr. 189)

prescribed in the past (Tr. 197). He also noted that he spoke with Plaintiff's attorney, and planned to schedule Plaintiff for a disability evaluation (Tr. 196-97).

Todd Stull, M.D., a psychiatrist in the same office as Mr. Russell, completed the disability evaluation on January 18, 2006 (Tr. 194–95). Dr. Stull reviewed Plaintiff's treatment history (Tr. 194). He opined, "I do not believe this patient is capable of working at this point in time" (Tr. 194). Dr. Stull also recommended continued treatment with Mr. Russell (Tr. 194). In a letter to Plaintiff's attorney completed that day, Dr. Stull remarked that Plaintiff suffered from severe panic attacks, was "held captive within his own house," and could not maintain a job or relationships (Tr. 226).

Linda Schmechel, Ph.D., a second state agency psychologist, reviewed Plaintiff's medical records on February 2, 2006 (Tr. 227). Dr. Schmechel affirmed Dr. Milne's November 8, 2005 assessment (Tr. 227).

Mr. Russell examined Plaintiff again on February 21, 2006 (Tr. 261). Plaintiff reported that he was doing better, but continued to struggle at times (Tr. 261). He claimed his mood was fairly stable on current medications (Tr. 261). Mr. Russell observed that Plaintiff was calm and pleasant, and had an agitated and depressed mood, fair insight and judgment, and moderate impulsivity (Tr. 261). Mr. Russell assessed a GAF score of 50[7] and increased Plaintiff's medications (Tr. 261).

About two months later, on April 21, 2006, Plaintiff informed Mr. Russell that he regularly worked out at a gym (Tr. 259). He remarked to Mr. Russell he had to decide "what he [was] going to do with his life" (Tr. 259). Mr. Russell and Plaintiff discussed his returning to school, or looking for employment (Tr. 259). Mr. Russell noted that Plaintiff appeared mildly to moderately depressed, and had fair insight and

---

[7] A GAF score of 41 to 50 indicates serious symptoms or serious impairment in social, occupational, or school functioning. *See* DSM-IV-TR 34 (4th ed. 2000).

judgment (Tr. 259). He assigned a GAF score of 55 to 60, and increased Plaintiff's medications (Tr. 259).

On June 21, 2006, Plaintiff told Mr. Russell that he was doing fairly well, and had started gardening and reading more (Tr. 257). Mr. Russell observed that Plaintiff was calm, pleasant, and cooperative, had a mildly depressed mood "at times," and showed good insight and intact judgment (Tr. 257). Mr. Russell assessed a GAF score of 55 to 60 (Tr. 257).

Mr. Russell saw Plaintiff again three months later, on September 21, 2006 (Tr. 256). Plaintiff claimed he was doing well (Tr. 256). Mr. Russell observed that Plaintiff had a normal mood and intact insight and judgment (Tr. 256). He assigned a GAF score of 60 to 65 (Tr. 256).

On December 12, 2006, Plaintiff told Mr. Russell he was doing fairly well, but experienced more mood fluctuations (Tr. 255). Mr. Russell noted that Plaintiff was pleasant and cooperative, but had a mildly dysphoric mood and fair insight and judgment (Tr. 255). He assigned a GAF score of 50 to 55, and prescribed antipsychotic medication to treat Plaintiff's panic attacks (Tr. 255).

On March 10, 2007, Plaintiff reported that he continued to struggle with mood (Tr. 254). He appeared calm, pleasant, and cooperative, with a fair mood, fair to good insight, and intact judgment (Tr. 254). Mr. Russell assigned a GAF score of 60 to 65 (Tr. 254).

During a follow-up appointment on June 20, 2007, Plaintiff reported that he was still doing fairly well, but experienced more panic attacks (Tr. 252). Plaintiff informed Mr. Russell that the panic attacks usually occurred when he went out in public (Tr. 252). Plaintiff appeared calm, pleasant, and appropriate, and had a mildly anxious effect, fair to good insight, and intact judgment (Tr. 252). Mr. Russell

-11-

assigned a GAF score of 60 to 65, and discontinued Plaintiff's antipsychotic medication (Tr. 252).

On July 5, 2007, Plaintiff reported recent manic episodes (Tr. 250). Mr. Russell observed that Plaintiff was "hyperpositive," and had fair to good insight, intact judgment, and moderate impulsivity (Tr. 250). Mr. Russell assigned a GAF score of 60 (Tr. 250). Mr. Russell also prescribed a new antidepressant (Tr. 250).

During an examination two weeks later, Plaintiff complained of fatigue due to lack of sleep (Tr. 248). Mr. Russell observed that Plaintiff appeared anxious and had linear thoughts, fair insight and judgment, and moderate impulsivity (Tr. 248). He assigned a GAF score of 60 (Tr. 249). Mr. Russell prescribed an anti-psychotic medication, and proposed treatment with lithium (Tr. 249).

Mr. Russell next examined Plaintiff on July 25, 2007 (Tr. 246–47). Plaintiff reported that the new medication was not helpful (Tr. 246). Upon examination, he exhibited a hyperpositive mood, linear thoughts, and "primarily nondelusional" thought content (Tr. 246). Mr. Russell assigned a GAF score of 50 to 55 (Tr. 246). He prescribed lithium and sleep medication (Tr. 246).

On August 9, 2007, Plaintiff reported doing "much better" with lithium (Tr. 245). He exhibited a normal mood, improved thought content, and "well intact" insight and judgment (Tr. 245). Mr. Russell assigned a GAF score of 50 to 55 and adjusted Plaintiff's medications (Tr. 245).

On August 23, 2007, Plaintiff told Mr. Russell that he felt much better and finally felt like he was getting some balance, although he still felt some paranoia at times (Tr. 243). Mr. Russell observed that Plaintiff had a normal to hypo-manic mood, generally nondelusional thoughts, and intact insight and judgment (Tr. 243). Mr. Russell assigned a GAF score of 50 to 55 and adjusted Plaintiff's medications (Tr. 243).

-12-

When Mr. Russell next saw Plaintiff on September 28, 2007, Plaintiff complained of increased sedation, mania, and depressive symptoms (Tr. 241). Mr. Russell found that Plaintiff had a depressed affect, good insight, and intact judgment (Tr. 241). Mr. Russell assigned a GAF score of 50 (Tr. 241). He discontinued Plaintiff's prescription for lithium and reduced his other medications (Tr. 241).

Plaintiff reported feeling much better during their next appointment on October 5, 2007 (Tr. 240). Mr. Russell found that Plaintiff was calm, pleasant, and appropriate, and had a "much more positive attitude, nondelusional thought content, and a normal affect (Tr. 24). He assigned a GAF score of 50 (Tr. 240).

On November 1, 2007, Plaintiff again reported that he was doing well on current medication (Tr. 239). He denied recent panic attacks, and claimed he was very happy with his medication (Tr. 239). Plaintiff had a normal to mildly dysphoric mood (Tr. 239). Mr. Russell assigned a GAF score of 50 to 55 (Tr. 239).

Plaintiff presented at the emergency room on December 4, 2007 to report back pain that had begun when he was lifting weights (Tr. 366–67). He complained that the pain radiated into his right leg (Tr. 367). Plaintiff received muscle relaxants (Tr. 369).

During an appointment later that day, Mr. Russell noted that Plaintiff had a mildly dysphoric mood due to back pain (Tr. 237). He assigned a GAF score of 50, and warned Plaintiff to exercise caution when using mood medication and muscle relaxants at the same time (Tr. 237).

Plaintiff returned to the hospital for a back checkup on December 29, 2007 (Tr. 361). He reported pain, but denied weakness or difficulty walking (Tr. 361). He was diagnosed with unspecified back pain and received valium (Tr. 361). On January 3, 2008, he underwent Magnetic Resonance Imagining (MRI), which showed a disc protrusion with radiculopathy in his lumbar spine (Tr. 358).

During a January 3, 2008 appointment with Mr. Russell, Plaintiff claimed he was doing fine aside from his back problem (Tr. 236). He claimed his mood was stable, and that he could sleep through the night (Tr. 236). Plaintiff expressed satisfaction with current medications (Tr. 236). Mr. Russell noted that Plaintiff had a fairly normal mood, but seemed in pain (Tr. 236). He assigned a GAF score of 50 to 55 (Tr. 236).

Plaintiff returned to the hospital the following day for back treatment, and was diagnosed with back pain and disc herniation (Tr. 354). On January 16, 2008, he met with a back specialist, who prescribed pain medication, physical therapy, weight loss, and exercise (Tr. 344-45).

Mr. Russell next examined Plaintiff on March 4, 2008 (Tr. 234–35). Plaintiff reported that his major concern was back pain, although his mood was "slightly down" lately (Tr. 234). Mr. Russell observed that Plaintiff was "pretty calm and cooperative," and had a normal mood and intact insight and judgment (Tr. 234). He assigned a GAF score of 60 to 65 (Tr. 234).

Plaintiff presented at the emergency room with increased back pain on March 10, 2008 (Tr. 331). He returned to the emergency room again four days later (Tr. 324).

On March 24, 2008, Plaintiff spoke with a surgeon about back problems (Tr. 322–23). He underwent surgery the following day (Tr. 317-20).

On April 1, 2008, Plaintiff informed Mr. Russell that he no longer felt pain or numbness in his legs (Tr. 232). He described his mood as "good" (Tr. 232). Plaintiff appeared calm, pleasant, and cooperative, with a positive attitude, a normal mood, and intact insight and judgment (Tr. 232). Mr. Russell assigned a GAF score of 60 (Tr. 232).

-14-

During a post-surgery followup on April 4, 2008, Plaintiff reported that his symptoms had resolved, aside from mild pain in his buttocks (Tr. 310). An examiner found that he had excellent lower extremity strength and a "much improved" gait, although he walked with a slight limp (Tr. 310).

Plaintiff presented at the emergency room after a slip-and-fall accident on April 23, 2008 (Tr. 306). He received pain medication, and was discharged in stable condition that day (Tr. 306–09).

During a May 9, 2008 session with Mr. Russell, Plaintiff reported feeling depressed over the last two weeks (Tr. 231). Mr. Russell noted Plaintiff's poor hygiene (Tr. 231). He adjusted Plaintiff's medication (Tr. 231).

Two weeks later, on May 23, 2008, Plaintiff claimed that he felt better and was not using pain medication, aside from occasional Ibuprofen use (Tr. 229). He also told Mr. Russell that he worked out every day (Tr. 229). Plaintiff appeared calm, pleasant, and cooperative (Tr. 229). He had a mildly dysphoric mood and fair insight and judgment (Tr. 229). Mr. Russell assessed a GAF score of 50 (Tr. 229). He adjusted Plaintiff's medication, and advised him to work out in the afternoon instead of taking naps (Tr. 229).

Mr. Russell prepared an affidavit on June 10, 2008 (Tr. 281–86). In the affidavit, Mr. Russell agreed with Dr. Stull's January 18, 2006 assessment that Plaintiff was "unable to work" (Tr. 281). He also opined that Plaintiff met the elements of listings 12.04 and 12.06 (Tr. 282–85).

On June 10, 2008, Plaintiff returned to the emergency room after falling on the treadmill (Tr. 300). X-rays of his right knee showed a small effusion and minor degenerative changes (Tr. 303). A examining source diagnosed a contusion (Tr. 300).

During another post-surgery followup on June 18, 2008, Plaintiff complained of continued pain in his right back and leg (Tr. 298). He also reported extensive treadmill use and weight-lifting (Tr. 298).

Plaintiff went to the emergency room again for medication refills on June 20, 2008 (Tr. 294–95). An x-ray of his right hip suggested femoral acetabular impingement syndrome (Tr. 293).

At the June 11, 2008 hearing, Plaintiff testified that he had back pain in his right leg and buttocks (Tr. 416). He testified that he worked at an Omaha Steaks [warehouse] about three years ago, but quit after a few days because he felt paranoid and "panicky" (Tr. 412). Plaintiff stated he lived with his aunt (Tr. 425, 428). He claimed that he spent "at least a week, a week and a half, out of every month" in bed due to depression (Tr. 424).

Plaintiff's aunt testified that Plaintiff shopped for his own groceries, prepared their dinners, washed dishes, vacuumed, cleaned his room and bathroom, and cared for four kittens (Tr. 433–35). She testified that Plaintiff was afraid of crowds and could not work due to mood swings (Tr. 436, 438-39).

The ALJ asked the vocational expert to consider a hypothetical claimant who could perform sedentary work with certain other physical restrictions (Tr. 452-53, 459). The ALJ also specified that the hypothetical claimant was markedly limited at interacting with the public, could not work in noisy environments, could not work within two or three yards of others, and would require five minutes to adjust to changes in work setting (Tr. 454–56). The vocational expert testified that hypothetical claimant could work as a packager (100 jobs in Nebraska and 25,000 nationwide), final assembler (325 jobs in Nebraska and 38,300 nationwide), and inspector/tester (130 jobs in Nebraska and 32,300 nationwide) (Tr. 459).

After the ALJ issued a decision, Plaintiff submitted new evidence to the Appeals Council (Tr. 370–71). The new evidence included a letter from Dr. Stull, dated June 11, 2008 (Tr. 371). In it, Dr. Stull endorsed Mr. Russell's conclusions in his June 10, 2008 affidavit (Tr. 371).

The new evidence also included a write-up from an October 3, 2008 psychiatric evaluation performed by Terry Davis, M.D., J.D. (Tr. 55–74). Dr. Davis noted in his evaluation that Plaintiff complained of panic attacks, which were triggered when he went out in public or was around groups of people (Tr. 57). Plaintiff reported that he enjoyed going to the gym (Tr. 60). Dr. Davis observed that Plaintiff was well groomed, pleasant, and cooperative, made good eye contact, and had rapid and pressured speech and thoughts, intact memory, decreased concentration, and low-average intelligence (Tr. 62-63). Dr. Davis diagnosed bipolar I disorder and panic disorder with agoraphobia, and assigned a GAF score of 51 (Tr. 63). Dr. Davis opined that Plaintiff met the requirements for listings 12.04 and 12.06 (Tr. 68–72). Dr. Davis indicated that Plaintiff was moderately limited in areas such as remembering and carrying out "very short and simple" instructions, and was markedly limited in areas such as remembering and carrying out detailed instructions, making simple work-related decisions, and "maintain[ing] socially appropriate behavior and . . . adher[ing] to basic standards of neatness and cleanliness" (Tr. 73–74).

## II.  DISCUSSION

The applicable standard of review is whether the Commissioner's decision is supported by substantial evidence on the record as a whole. *See Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). " Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." *Id.* (internal quotations and citations omitted).  Evidence that both supports and detracts from the Commissioner's decision should be considered, but a final administrative decision is not subject to reversal by a reviewing court merely because some evidence in the record may support a different conclusion.  *See id.*

Questions of law, however, are reviewed de novo. *See Olson v. Apfel*, 170 F.3d 822 (8th Cir. 1999); *Boock v. Shalala*, 48 F.3d 348, 351 n2 (8th Cir. 1995). Legal error may be an error of procedure, *Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003), the use of erroneous legal standards, or an incorrect application of the law, *Nettles v. Schweiker*, 714 F.2d 833, 836 (8th Cir. 1983).

### A.   Medical Sources

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources[8] that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite impairment(s), and [his] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). The weight the Commissioner will give to an opinion depends upon (1) whether the source examined the claimant, and, if so, the frequency of examination; (2) whether the source treated the claimant, and, if so, the length, nature, and extent of the treatment relationship; (3) whether the opinion is supported by relevant evidence; (4) whether the opinion is consistent with the record as a whole; (5) whether the source is a specialist; and (6) any other relevant factors. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d).

"If [the Commissioner] find[s] that a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, [the Commissioner] will give it controlling weight." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).[9] "In many cases, a treating source's medical opinion will be entitled

---

[8] A physician's assistant is not an "acceptable medical source." *See* 20 C.F.R. §§ 404.1513(a), 416.913(a).

[9] A "treating source" is an acceptable medical source who provided the claimant "with medical treatment or evaluation and who has, or has had, an ongoing treatment

to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin., July 2, 1996). An adverse decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Id.

"Although the factors in 20 CFR 404.1527(d) and 416.927(d) explicitly apply only to the evaluation of medical opinions from 'acceptable medical sources,' these same factors can be applied to opinion evidence from 'other sources.'" SSR 06-03p, 2006 WL 2329939 , at *4-5 (Soc. Sec. Admin., Aug. 9, 2006). Thus, factors for considering opinion evidence from "other sources" (both medical and non-medical) include (1) how long the source has known and how frequently the source has seen the individual; (2) how consistent the opinion is with other evidence; (3) the degree to which the source presents relevant evidence to support an opinion; (4) how well the source explains the opinion; (5) whether the source has a specialty or area of expertise related to the individual's impairment(s); and (6) any other factors that tend to support or refute the opinion. See id. at *4-5.

"Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not 'acceptable medical sources' and from 'non-medical sources' who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant

---

relationship with [the claimant]." 20 C.F.R. §§ 404.1502, 416.902.

or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.* at *6.

"The fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source'. . .. However, depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an 'acceptable medical source' if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion." *Id.* at *5.

The ALJ determined that "[t]he opinions of Dr. Stull and Mr. Russell are not reflective of clinical findings; are not consistent with other substantial medical evidence of record; and are not entitled to great weight, under SSRs 96-2p and 06-3p." (Tr. 25) He further explained:

> As for the opinion evidence, the undersigned has considered the opinions of Dr. Stull and Mr. Russell, both of whom opined the claimant's bipolar affective disorder and panic disorder with agoraphobia caused the claimant to be unable to work. The undersigned has not given great weight to either opinion. Dr. Stull is an acceptable medical source, but he apparently has seen the claimant only once, and his opinion appears to be based on Mr. Russell's observations in progress notes. Mr. Russell is not an acceptable medical source; he is qualified as a physician's assistant, and his curriculum vitae appears at Exhibit 10F/7, showing no evidence of training as a licensed mental health practitioner or social worker.

> Mr. Russell opined the claimant is unable to work and meets sections l2.0A, B, and C and 12.06A, B, and C of the Listing of

Impairments, with, among other features, marked limitations in daily activities, social functioning, and concentration. However, Mr. Russell's opinion that the claimant is disabled from any and all types of work is not supported by his progress notes, which consistently rate the claimant's Global Assessment of Functioning ("GAF") within the range of 50 to 65 out of a possible 100. (Exhibit 8F) In January 2006, Mr. Russell opined the claimant had sufficient grounds to file for disability at that time (Exhibit 8F/35), but Mr. Russell's progress notes also show the claimant has had extended periods of improved mood and function in the three years of therapy with Mr. Russell. (Exhibit 8F)

(Tr. 25)

Plaintiff admits "that Dr. Stull's personal and direct treatment of [him] is thin," but argues that "the treatment provide[d] by his Physician's Assistant, PA Russell, should be viewed as treatment by Dr. Stull." (Filing 12 at 6)  He also claims that "the medical opinion of Dr. Stuff [sic], in combination with that of PA Russell, should be given controlling weight." (Filing 12 at 27)

There is no evidence Dr. Stull provided any treatment to Plaintiff.  Instead, Mr. Russell's notes show that he "schedule[d] the patient with Dr. Todd Stull for evaluation for his disability claim, so that Dr. Stull can also write a letter with his opinion." (Tr. 197)  Dr. Stull's notes from January 18, 2006, also indicate that he saw Plaintiff "to evaluate him for disability." (Tr. 194) The notes contain a summary of Plaintiff's complaints and the treatment provided by Mr. Russell, but no independent observations by Dr. Stull himself.

The Commissioner "will not consider an acceptable medical source to be [the claimant's] treating source if [the claimant's] relationship with the source is not based on [a] medical need for treatment or evaluation, but solely on [a] need to obtain a report in support of [the] claim for disability. In such a case, [the Commissioner] will consider the acceptable medical source to be a nontreating source." 20 C.F.R. §§

404.1502, 416.902.  As a "nontreating source," Dr. Stull's opinion is not entitled to controlling weight. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Nor can Mr. Russell's opinion be given controlling weight simply because Plaintiff was seen once by Dr. Stull. In some cases, "other medical sources" may be considered "treating sources" when they are part of a treatment team that includes an acceptable medical source.  *See Shontos v. Barnhart,* 328 F.3d 418, 426 (8th Cir. 2003) (holding that consistent opinions provided by members of mental health treatment team, including clinical psychologist, nurse practitioner, and counselor, were entitled to greater weight than those of nontreating, nonexamining consultants). In the present case, though, the evidence does not establish that a team approach was used in treating Plaintiff.  *See, e.g., Lacroix v. Barnhart,* 465 F.3d 881, 886 (8th Cir. 2006) (distinguishing case from *Shontos* because reports of therapists and nurse practitioner did not refer to a doctor's participation in claimant's care).

In a letter to Plaintiff's attorney, dated January 18, 2006, Dr. Stull provided the following opinions regarding Plaintiff's mental condition:

> It is my opinion that he suffers from bipolar affective disorder and panic disorder with agoraphobia.  I do not believe he is capable of working at this point in time.  I do not believe he is capable of handling the stress and responsibility of work or being around other people.  I believe that in the future that his illness can improve with treatment, and that he may be able to be gainfully employed.

(Tr. 226) The ALJ accepted Dr. Stull's diagnosis and, in determining Plaintiff's RFC, found that he would be unable to interact with the general public or work in close proximity with others. The ALJ rejected Dr. Stull's opinion that Plaintiff was not capable of working, but this was not a *medical* opinion. *See* 20 C.F.R. §§ 404.1527(e), 416.927(e) (medical source's statement that claimant is "disabled" or "unable to work" is not a medical opinion; the question of disability is a case-dispositive issue that is reserved to the Commissioner).  Thus, even if Dr. Stull could be considered a

-22-

treating source, his opinion is not entitled to deference.  *See House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007) ("A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination.")*; see also Randolph v. Barnhart*, 386 F.3d 835, 840 (8th Cir. 2004) (treating physician's opinion properly discredited where she saw claimant only three times and treatment notes did not indicate she had sufficient knowledge to formulate opinion regarding claimant's ability to function in workplace).  Also, "[a] treating physician's opinion deserves no greater respect than any other physician's opinion when the treating physician's opinion consists of nothing more than vague, conclusory statements."  *Charles v. Barnhart*, 375 F.3d 777, 783 (8th Cir. 2004).

In an affidavit prepared on June 10, 2008, one day before the ALJ's hearing, Mr. Russell refers to Dr. Stull's January 18, 2006 letter and states that he "agree[s] with Dr. Stull's statements describing the mental disorders from which Quentin suffers and based upon Quentin's condition he could not reasonably be expected to do any gainful activity.  Those disorders continue and the statements made by Dr. Stull appropriately describe Quentin's current condition."  (Tr. 281) Mr. Russell further states that he "agree[s] with Dr. Stull's assessment that the degree of limitation such impairments [of bipolar disorder and panic disorder] impose on Quentin make him unable to work." (Tr. 281) Again, this is not a medical opinion and is not entitled to deference.

Mr. Russell's affidavit takes the form of a medical source statement in which he outlines the various requirements of listings 12.04 (pertaining to "affective disorders") and 12.06 (pertaining to "anxiety related disorders") and identifies "by BOLD typeface those which apply to Quentin." (Tr. 282) Mr. Russell indicates, without benefit of any explanation,[10] that the paragraph "B" criteria are satisfied for

---

[10] A medical source statement cannot be discounted "on the basis that the 'evaluation by box category' is deficient *ipso facto*," but where the limitations listed

both listings because Plaintiff (1) has "marked" limitations (a) in activities of daily living, (b) in maintaining social functioning, and (c) in maintaining concentration, persistence, or pace, and (2) has had repeated episodes of decompensation, each of extended duration (Tr. 283, 285).[11]

By contrast, the state agency's consulting psychologist, Dr. Milne, found after reviewing the medical records that Plaintiff has only moderate limitations in maintaining social functioning and concentration, persistence, or pace, and has had no episodes of decompensation (Tr.181). Dr. Milne also determined that the paragraph "C" criteria were not satisfied for either listing (Tr. 182).

Mr. Russell, on the other hand, opined that because of Plaintiff's bipolar disorder, (1) Plaintiff had experienced repeated episodes of decompensation, (2) "even a minimal increase in mental demands or change in the environment would be predicted to cause [Plaintiff] to decompensate," and (3) Plaintiff has a "[c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." (Tr. 284)[12] Mr. Russell also opined that Plaintiff's panic disorder resulted in "complete inability to function independently outside the area of one's home" (Tr. 285), thereby satisfying the paragraph "C" criterion for listing 12.06.

Although Plaintiff argues that Mr. Russell's opinion is entitled to more weight than Dr. Milne's opinion, I conclude that it was proper for the ALJ to discount

---

on the form "stand alone" and are not mentioned in treatment records nor supported by any objective testing or reasoning, the statement may be entitled to little or no weight. *See Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005).

[11] At least two of these four conditions must exist in order to satisfy the paragraph "B" criteria for listings 12.04 and 12.06.

[12] Any one of these three conditions satisfies the paragraph "C" criteria for listing 12.04.

Mr. Russell's opinion as being inconsistent with his own progress notes, in which he noted Plaintiff's extended periods of improved mood and function during three years of therapy and regularly assigned Plaintiff GAF scores from 50 to 65. This range of scores suggests moderate limitations, not an inability to work. *See DSM-IV-TR* 34; *Halverson v. Astrue*, 600 F.3d 922, 930–31 (8th Cir. 2010). "In determining what weight to give 'other medical evidence,' the ALJ has more discretion and is permitted to consider any inconsistencies found within the record." *Lacroix*, 465 F.3d at 887 (8th Cir. 2006); *Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005).

After the ALJ issued his decision, Plaintiff submitted to the Appeals Council (1) a letter from Dr. Stull and (2) a report of a psychiatric evaluation conducted by Terry A. Davis, M.D., J.D. (Tr. 36, 42). In the letter, which is dated June 11, 2008, Dr. Stull simply states:

> I have reviewed Calvin Russell's affidavit/assessment of Quentin Fredrickson dated June 10, 2008. I agree with the assessment. It is my professional opinion with a reasonable degree of medical certainty.

(Tr. 371) Dr. Davis's report also generally supports Mr. Russell's assessment that Plaintiff met listings 12.04 and 12.06 (Tr. 55-74, 370).

Under agency regulations, the Appeals Council must consider additional evidence that is new, material, and relates to the period on or before the date of the ALJ's decision. *See Lamp v. Astrue*, 531 F.3d 629, 632 (8th Cir. 2008); 20 C.F.R. §§ 404.970(b), 416.1470(b). The record in the present case shows that the Appeals Council considered the additional evidence but "found that this information does not provide a basis for changing the Administrative Law Judge's decision." (Tr. 4-5) "In this circumstance, the reviewing court "do[es] not evaluate the Appeals Council's decision to deny review, but rather . . . determine[s] whether the record as a whole, including the new evidence, supports the ALJ's determination." *Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir. 2000). Plaintiff argues that if the Appeals Council had

-25-

given proper weight to the opinions of Dr. Stull and Dr. Davis, it should have found that he met the requirements of listings 12.04 and 12.06.

## B. The Listings

At the third step of the sequential evaluation, the ALJ must determine whether the claimant's impairments meet or equal the severity of any listed impairment. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant's impairments meet or equal the criteria for a listed impairment, the claimant is found disabled. *See id.* If not, the ALJ must proceed to step four. *See id.*

"The burden of proof is on the plaintiff to establish that his or her impairment meets or equals a listing." *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004). "To meet a listing, an impairment must meet all of the listing's specified criteria." *Id.*

Plaintiff argues that the ALJ should have found he met listing 12.04, which describes affective disorders, and listing 12.06, which describes anxiety-related disorders. To meet these listings, Plaintiff had to satisfy the listings' paragraph "A" criteria, plus either their paragraph "B" or paragraph "C" criteria. It is undisputed that Plaintiff's bipolar disorder satisfied paragraph "A" of listing 12.04 and that his panic disorder with agoraphobia satisfied paragraph "A" listing 12.06.  However, the ALJ found that Plaintiff's "mental impairments, considered singly and in combination, do not meet or medically equal the [paragraph "B" or "C"] criteria of listings 12.04 or 12.06."  (Tr. 22)

To satisfy paragraph "B" of either listing, Plaintiff had to show at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or

-26-

4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. pt. 404, subpt. P., App. 1 §§ 12.04B, 12.06B.

A "marked" limitation is "more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. pt. 404, subpt. P., App. 1 § 12.00C. "Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." *Id.* "Social functioning refers to [the claimant's] capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals." *Id.* "Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." *Id.*

"Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode." *Id.*

-27-

"The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. If [the claimant] ha[s] experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, [the Commissioner] must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence." *Id.*

The ALJ determined that "[b]ecause the claimant's mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation the 'paragraph B' criteria are not satisfied."  (Tr. 22) Specifically, the ALJ found:

In activities of daily living, the claimant has mild to moderate restriction. The claimant's daily activities include washing dishes, vacuuming, keeping his bathroom clean, taking care of four pet kittens, cleaning the litter box, and preparing meals.

In social functioning, the claimant has moderate difficulties that can increase to marked difficulties in the presence of crowds. However, the vocational expert identified thousands of jobs the claimant could do that would not involve crowds or unreasonable noise.

With regard to concentration, persistence, and pace, the claimant has moderate difficulties that can increase to marked difficulties in crowded situations. Again, the claimant's inability to function in crowds of people or excessive noise would not preclude him from working. The claimant is able to stay on task to perform the daily activities referenced above, which demonstrates significant mental residual functional capacity.

The claimant has experienced no episodes of decompensation of extended duration. He has not been hospitalized for psychiatric treatment.

-28-

(Tr. 22) The ALJ also found that "the evidence fails to establish the presence of the 'paragraph C' criteria. The claimant has not had recurrent episodes of decompensation of extended duration, would not decompensate in the event of a minimal increase in mental demands; has not required a highly supportive living arrangement; and is capable of functioning appropriately outside his home."  (Tr. 22)

As previously discussed, Mr. Russell found that Plaintiff satisfied all 4 of the paragraph "B" criteria for both listings, and Dr. Stull endorsed this finding.  Dr. Davis also was in agreement.  He made these findings regarding the functional limitations associated with Plaintiff's bipolar disorder (listing 12.04):

    1. Restriction of activities of daily living: Marked - His history and records indicate that he is really able to function only in a supportive environment, i.e., living with his aunt. As recently as May of 2008 he displayed significant deficits in personal grooming and hygiene when depressed. During periods of severe depression he reports not being able to get out of bed for days at a time.

    2. Difficulties in maintaining social functioning: Marked - He has no friends, no social life, and extreme difficulty interacting appropriately with others. He experienced significant difficulty at his last job at Omaha Steaks due to his harassing his supervisor. He has periods of paranoia and mild psychotic symptoms.

    3. Difficulties in maintaining concentration, persistence, or pace: Marked - He is distractible and has difficulty maintaining attention, particularly in noisy or busy settings. He displayed significantly decreased concentration during my evaluation of him, which occurred in a small, quiet office with just the two of us present.

    4. Episodes of decompensation, each of extended duration: Four or more - His records document that he has experienced manic and hypomanic episodes in the months of 9-05, 10-05, 12-05, 12-06, 7-07, 8-07, and 9-07. He has experienced depressive episodes in the months of 10-05, 4-06, 6-06, 12-06, 9-07, 11-07, 12-07, 3-08, and 5-08. In the intervals between the above episodes his mood has moved more toward

-29-

> normality, but the key factor is the recurrent and unpredictable nature of his mood swings. He does not know from one week to the next, or even one day to the next, how he will feel emotionally, how unstable his mood will be, and how impaired his functioning will be. Such an unstable mood pattern makes it extremely difficult if not impossible to predict his behavior on a daily basis and to maintain employment.

(Tr. 70) Similarly, with respect to the paragraph "B" criteria of listing 12.06, Dr. Davis found Plaintiff has marked functional limitations and had episodes of decompensation:

> 1. Restriction of activities of daily living: Marked - He suffers from Agoraphobia in conjunction with his Panic Disorder. He experiences periods where he is unable to leave his house and perform such essential functions as going to the store, grocery shopping, etc.

> 2. Difficulties in maintaining social functioning: Marked - He is likewise severely impaired and limited in is ability to function in social situations. He is fearful of crowds and places where he may encounter groups of people. He even experiences significant anxiety when placed in new or unfamiliar situations that do not involve crowds, such as the 1 on 1 interview in my office.

> 3. Difficulties in maintaining concentration, persistence, or pace: Marked - His records repeatedly document his poor concentration and when I evaluated him on 10-3-08 he displayed poor concentration in the quiet setting of my office. Likewise, he has a history of and displayed psychomotor retardation, which significantly impairs his ability to persist at a task or maintain pace.

> 4. Episodes of decompensation, each of extended duration: . Four or more - His records document that he has experienced significant anxiety episodes in 11-05, 12-05, 1-06, 2-06, 12-06, 6-07, and 7-07.

(Tr. 72)

-30-

The Commissioner notes that Dr. Davis's discussion of the paragraph "B" criteria relied heavily on Plaintiff's subjective complaints. For example, in finding Plaintiff markedly limited in terms of daily activities, Dr. Davis emphasized that Plaintiff "reports not being able to get out of bed for days at a time" (Tr. 70). The ALJ found this particular complaint was not credible in view of the record . In assessing marked limitations in concentration, persistence, or pace, Dr. Davis stated that Plaintiff's medical records "repeatedly document his poor concentration." (Tr. 72) Actually, these records (as summarized in Dr. Davis's report at Tr. 58-59) merely document Plaintiff's complaints of poor concentration. (See Mr. Russell's progress notes for 10-21-05 (Tr. 203), 11-2-05 (Tr. 201), 12-12-05 (Tr. 200), and 12-27-05 (Tr. 198)). On the two occasions that Mr. Russell actually evaluated Plaintiff's attention and concentration, he observed no deficiencies. (See Mr. Russell's progress notes for 6-24-05, stating that "[t]he patient describes difficulties of attention, but not severe enough to be detectible on exam" (Tr. 217), and 7-12-05, stating that "[a]ttention and concentration are intact" (Tr. 215)).

Dr. Davis's opinion is not supported by relevant evidence.  He counts nearly every fluctuation in Plaintiff's functioning as an extended episode of decompensation. Indeed, he indicated that Plaintiff experienced extended episodes of decompensation in November 2005 and June 2007 (Tr. 72), even though Mr. Russell assigned Plaintiff GAF scores of 60–65 during these intervals (Tr. 201, 252). Even if the episodes that Dr. Davis describes had been severe enough to constitute episodes of decompensation, it is not shown that they were of extended duration, or that extended episodes occurred at least three times per year.

Dr. Davis's conclusions also appear inconsistent with his own clinical observations. Even though Dr. Davis found Plaintiff had intact memory and low-average intelligence upon examination, he opined that Plaintiff would be moderately limited at remembering and understanding even "very short and simple" instructions, and was markedly limited at making simple work-related decisions (Tr. 74). Dr. Davis also described Plaintiff as "well groomed," "pleasant," and

-31-

"cooperative" during his interview, but he assessed marked limitations in the category of "maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness" (Tr. 74). Dr. Davis's relatively mild examination findings do not support the range of marked limitations he assessed.

To satisfy paragraph "C" of listing 12.04, Plaintiff had to show at least on one of the following:

      1. Repeated episodes of decompensation, each of extended duration; or

      2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

      3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement,[13] with an indication of continued need for such an arrangement.

20 C.F.R. pt. 404, subpt. P., App. 1 § 12.04C.

In Dr. Davis's opinion, the first two paragraph "C" criteria for listing 12.04 were met and the third criteria was close to being met:

      1. Repeated episodes of decompensation, each of extended duration: Present - See the above discussion under B.4. regarding the unstable nature of his mood and his repeated episodes of decompensation.

---

[13]A "highly supportive living arrangement" may be "a hospital, halfway house, board and care facility, or other environment that provides similar structure." *See* 20 C.F.R. pt. 404, subpt. P., App. 1 §12.00.F.  "Highly structured and supportive settings may also be found in [the claimant's] home."  *Id.*

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate:  Present - His Bipolar I Disorder has been present for at least several years and is quite chronic. When even minimal demands are placed on him decompensates and experiences a significant worsening of his mood symptoms, particularly depression. He was unable to tolerate working at Omaha Steaks for more than a couple of days as a result of his mental illness.

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement: Partially present - While his condition is not yet severe enough that he requires placement in an environment such as an assisted living facility or a group home, he does live with his aunt, who provides him with additional social and functional support. It is unlikely that he would be able to function safely or adequately outside of such an environment.

(Tr. 71) Dr. Davis did not express an opinion as to whether the paragraph "C" criterion for listing 12.06 ("complete inability to function independently outside the area of one's home") was satisfied.

Again, these conclusions are not supported by relevant evidence and are inconsistent with the medical record.  Dr. Davis points to Plaintiff's unsuccessful attempt to work at Omaha Steaks as demonstrating an inability to cope with even a minimal increase in mental demands or change in the environment, but Mr. Russell's progress notes of December 27, 2005, indicate that Plaintiff was "unjustifiably fired" from the job "after a brief episode of harassing [by?] his supervisor."  (Tr. 198)[14] On December 12, 2005, a few days after starting work at Omaha Steaks, Plaintiff reported to Mr. Russell "that it has been quite anxiety provoking for him being there, but he is able to deal with it thus far."  (Tr. 200)

---

[14] However, Plaintiff testified at the hearing that he "just walked off the job" because he "got paranoid . . . [and] panicky" on new medication.  (Tr. 412-13)

Although Dr. Davis is very well-qualified to provide medical opinions, his discussion of listings 12.04 and 12.06 appears intent on proving that Plaintiff meets the necessary legal requirements to receive benefits. As such, it does not rebut the ALJ's findings, which are supported by the opinions of the state agency consulting psychologists. (Tr. 174, 176, 227) *See House*, 500 F.3d at 744–45 (ALJ could discount a medical opinion that was "obviously based upon [the physician's] understanding of the relevant disability criteria, not on medical evidence"). Plaintiff failed to meet his burden of proof.

### C.  Plaintiff's Credibility and Residual Functional Capacity

A claimant's residual functional capacity represents the most he can do despite the combined effect of his credible limitations. *See* 20 C.F.R. §§ 404.1545, 416.945. The ALJ is responsible for assessing a claimant's RFC based on all the relevant evidence, including the claimant's description of his limitations, the medical records, and observations of the claimant's physicians and others. *See Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). In making this assessment, the ALJ has discretion to discredit a claimant's self-reported limitations if he determines they are inconsistent with the record based on his evaluation of the relevant factors set forth in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), and 20 C.F.R. §§ 404.1529, 416.929. Such factors include the claimant's prior work records; observations by third parties and physicians regarding the claimant's disability; the claimant's daily activities; the duration, frequency, and intensity of pain; precipitating and aggravating factors; dosage, effectiveness and side effects of medications; and the claimant's self-imposed functional restrictions. *See Polaski*, 739 F.2d at 1322. "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) (quoting *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010)). "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." *Id.*

-34-

The ALJ found that Plaintiff "has no limitation in the areas of understanding, remembering, and carrying out short simple instructions or in the area of complex instructions, although he has intrusive thoughts that would affect concentration. There is no limitation on making judgments on simple work-related decision, except with regard to his ability to focus. There is marked limitation on his ability to interact with the public. . . . [He] would be unable to work in a noisy environment . . . or one in close proximity to other people in a cubicle situation.  However, if the distance exceeded two or three yards, the claimant could function."  (Tr. 23) The ALJ also determined that Plaintiff would require "five minutes" to adjust to "changes in a routine work setting" or to "a change in job tasks."  (Tr. 23) The ALJ explained:

> The claimant testified he has tried multiple medications for his psychological symptoms but that he developed a tolerance for them and they became ineffective. He said Zyprexa is effective but that it makes him lethargic. He stated he "hit bottom" in 2002, quit "smoking, drinking, and drugging," and after a time was taken in by his aunt, who also testified at the hearing, stating the claimant had resided with her since 2002. Ms. Fredrickson's testimony is considered later in this decision. The claimant reported back pain following surgery in March 2008, but the twelve month duration requirements of 20 CFR 404.1509 and 416.909 have not been met.

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below.

> In terms of the claimant's alleged inability to tolerate crowds of people, Ms. Howell, the vocational expert, testified that, even if the claimant were precluded from interaction with the general public and were limited to work settings in which he would be at least two or three yards from the nearest co-worker, he still would be capable of performing thousands of jobs in the local, regional, and national

-35-

economy. Similarly, Ms. Howell testified that even if the claimant were limited to sedentary work, he could perform these significant numbers of jobs.

The undersigned has considered the testimony of the claimant and his aunt, Deborah Fredrickson, that since 2002 his depression had caused him to stay in bed for one to one and one-half weeks per month. However, if the claimant's depression is of this severity, additional psychiatric intervention presumably would have been pursued. The claimant testified he has [been] seeing John Russell, PA-C, approximately once per month since 2005, more often if the claimant is in a "rough patch." Mr. Russell's progress notes fail to show that the claimant's depression is of such severity that the claimant is unable to leave his bed for seven to ten days per month. Mr. Russell rated the claimant's Global Assessment of Functioning as between 50 and 65 for most of the period beginning June 2005, when treatment with Mr. Russell began. (Exhibit 8F) The claimant testified he had considered hospitalization but that he was fearful of the "mental ward." Ms. Fredrickson said she had investigated additional therapy for the claimant but could not afford it. . . .

\* \* \*

The record as a whole suggests the claimant has not explored therapy available to him, other than that of Mr. Russell, who may be unaware of the claimant's statement that his depression keeps him in bed for one week to ten days per month. The claimant resides with his aunt, who provides financial support for the claimant to augment his monthly general assistance payment of $225. The claimant and his aunt may be unaware of additional treatment and resources that may be available to him. The residual functional capacity findings set forth above describe the claimant's level of function with appropriate treatment.

\* \* \*

The claimant's aunt testified the claimant had resided with her since 2002. She said he was afraid of crowds, and she described "roller coaster" mood swings. She said she had looked into additional therapy

-36-

but could not financially afford it. She said the claimant had difficulty attending events where there were crowds of people, including movie theatres and church. However, Ms. Fredrickson testified that the claimant can do tasks at home, including washing dishes, vacuuming, keeping his bathroom clean, taking care of four pet kittens: and preparing meals.

The testimony of Ms. Fredrickson is generally credible and is consistent with other reports that the claimant sometimes is unable to get out of bed and that he is very uncomfortable in crowds. The undersigned has considered Ms. Fredrickson's testimony. However, at the hearing, the vocational expert identified thousands of jobs the claimant could do, even if he were unable to interact with the general public, co-workers or supervisors.

. . . [T]he claimant's activities of daily living and functional limitations have been described above and show significant physical and mental residual functional capacity. Regarding aggravating and precipitating factors, as well as the duration, frequency, and duration of his symptoms, the claimant reported feelings of discomfort when confronted with crowds of people. In that regard, his occupational base still would be substantial, even if jobs were limited to those not involving crowds or large groups of people. The claimant testified the only medication that worked, Zyprexa, caused lethargy; however, progress notes show that Zyprexa was "sedating" but that Zyprexa was discontinued because of a marked increase in the claimant's appetite. (Exhibit 8F/21) In August 2005, the claimant was "dramatically improved on Zoloft." (Exhibit 5P/22) The claimant's earnings record shows significant earnings in 1999 and 2000 that substantially dropped in 2001 and have remained low to none since 2001. However, a limited work history cannot alone form the basis for a finding of disability, particularly when there are inconsistencies in the record as a whole.

As noted above, the claimant underwent back surgery in March 2008, after an exacerbation of back pain in December 2007. Extensive records at Exhibit 11F shows the claimant is recovering from his back surgery, and the undersigned finds the claimant will be capable of performing sedentary work by December 2008. Accordingly, the

-37-

claimant's back impairment and limitations do not meet the twelve-month duration requirements of 20 CFR 404.1509 and 416.909.

The claimant alleges disability since July 2003 but except for a foot injury in April 2003, which apparently healed satisfactorily, the medical evidence of record is silent until treatment by Mr. Russell began in June 2005. (Exhibits 5F/28, 5F/29, SF/30, 5F/31, 5F125) . . .

* * *

In sum, the above residual functional capacity assessment is supported by Mr. Russell's progress notes, which consistently rate the claimant's GAF within the 50 to 65 range and document extended periods with increased mood and function, testimony indicating the claimant has not received additional therapy or treatment that might be available to him; and testimony about the claimant's daily activities.

(Tr. 24-27)

The ALJ did not believe Plaintiff's testimony that he is bedridden for days at a time every month because of depression.[15] If Plaintiff's depressive episodes were this severe, the ALJ reasoned, Plaintiff surely would have informed Mr. Russell, but his progress notes during the period from June 24, 2005, until May 23, 2008, covering more than 30 office appointments (Tr. 196-218 , 229-77), make no mention of Plaintiff not being able to get out of bed.  "While an ALJ may not discredit subjective complaints based solely on the lack of objective medical evidence, *see Brosnahan v. Barnhart, 336 F.3d 671, 677-78 (8th Cir.2003)*, an ALJ may use the lack of such evidence as one credibility factor, *see Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir.2003)*[.]" *Pitman v. Barnhart, 116 Fed.Appx. 774, 775, 2004 WL 2699104, at *1 (8th Cir. 2004).*

---

[15] Plaintiff testified that "at least a week, a week and a half, out of every month, I was terrible [sic] depressed, and in, in , in bed. . . .  I'd lay in bed until my legs hurt so bad that I have to get up and move. . . .  Usually, that'd be three or four days."  (Tr. 424) Plaintiff's aunt also testified that he "can be in his bed for days, days." (Tr. 440)

The ALJ also observed that Mr. Russell consistently assigned GAF scores in the range of 50 to 65 (Tr. 25). Although a score of 50 is consistent with "serious" symptoms, Plaintiff typically received scores of 51 or better, consistent with "moderate" symptoms. *See DSM-IV-TR* 34. A moderate score is appropriate for a patient who has "few friends" or who experiences "conflicts with peers or co-workers." *Id.* These scores describe a person who experiences some work limitations, not a person who is unable to work. *See Halverson*, 600 F.3d at 930–31 (ALJ could rely in part on GAF scores "between 52 and 60" in discounting reports that suggested the claimant "would be unable to maintain consistent employment"). Plaintiff's range of scores would not be appropriate for a patient who was confined to bed for days at a time. *See DSM-IV-TR* (listing "stays in bed all day" as a symptom associated with GAF scores in the range of 21 to 30).

I cannot say that the ALJ, who had the benefit of hearing Plaintiff's testimony firsthand and assessing his demeanor, erred by finding Plaintiff not fully credible. I must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Boettcher v. Astrue*, __ F.3d __, 2011 WL 3802780, at *2 (8th Cir. 2011) (quoting *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006)). *See also Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) ("If the ALJ discredits a claimant's credibility and gives a good reason for doing so, we will defer to its judgment even if every factor is not discussed in depth."). The ALJ has provided good reasons for his credibility findings and there is substantial evidence to support them.

I also find there is substantial evidence to support the ALJ's assessment of Plaintiff's residual functional capacity. The ALJ appears to have considered all credible evidence in the record to find, for example, that Plaintiff is markedly limited in his ability to interact with the public. In discussing whether Plaintiff's impairments met the listings, the ALJ also stated that "[i]n social functioning, the claimant has moderate difficulties that can increase to marked difficulties in the presence of crowds." (Tr. 22) Similarly, the ALJ found that "[w]ith regard to concentration,

persistence, and pace, the claimant has moderate difficulties that can increase to marked difficulties in crowded situations." (Tr. 22) The ALJ stated that because of these "marked" limitations in crowds, Plaintiff "would be unable to work in a noisy environment, such as one with general conversation in close proximity; one with constant ringing telephones and rustling of papers; or one in close proximity to other people in a cubicle situation. However, if the distance exceeded two or three yards, the claimant could function." (Tr. 23) The ALJ also determined that Plaintiff would need "five minutes" to adjust to "changes in a routine work setting" or to "a major change in job tasks." (Tr. 23)

Plaintiff contends there is no evidence to support the ALJ's determination that his anxiety and panic disorder would not preclude him from functioning in a workplace environment where he was situated two or three yards away from others and was allowed five minutes to adjust to changes. While it is true there is no direct testimony to this effect, and no medical source opinion that imposes these precise limitations, the ALJ was merely attempting to convey that Plaintiff cannot work in a cubicle-like setting or in an occupation where the work setting changes frequently. This is made clear in the hypothetical question that the ALJ posed to the vocational expert at the hearing.

After describing a hypothetical individual who has the same education, work experience, and physical limitations as Plaintiff, the ALJ asked the vocational expert additionally to assume the following mental limitations:

> Q . . . There is no limitation in his ability to understand, remember, or carry out short, simple instructions. . . . [T]here is no limitation on his ability to understand, or remember, or carry out complex instructions, except that there are intrusive thoughts that would affect his ability to concentrate, but cognitively, he has no limitation specifically on the ability to understand, remember, and carry out complex instructions, other than what I will get to in the remainder of this, this RFC. There's no limitation on the ability to make judgments on either simple or complex work-related discussions, except as will be discussed regarding

-40-

the ability to focus. There is a marked limitation on the ability to interact appropriately with the public. And I use the term, marked, because marked has a specific definition. I will give you something a little more specific. If he -- if this hypothetical individual was in a competitive work situation, and he was approached by a member of the public, he might freeze up. He might not be able to answer. And that would almost become extreme. But I say, marked, because there's some question about, about when the condition would exacerbate or how frequently it would exacerbate. So, generally speaking, it's marked. But he, he would freeze, he would, he would not be able to respond, and that would be any contact with the public.

A All right.

Q Even if there is the public who's out and about. He also does not have a limitation in terms of noise, but -- in terms of it being painful, but he would not be able to work in a noisy environment. I don't mean pounding, or machinery, or anything like that; but I mean noise produced by general conversation of other people in close proximity where there was a lot of constant use of the telephone, with telephone ringing, people responding, the quick ruffling of -- where -- of pages, where there was -- or a lot of typing, loud typing in very close proximity, and we're talking about standard cubicles, which would be distracting, not because of the noise, but because of the close proximity of other people.

A All right.

Q And we're talking about the distance of, of a standard cubicle, which I would -- which would be what? What would be approximately two or three yards?

A That seems right.

Q All right. However, if the distance between coworkers exceeds that distance, where it doesn't have that noisy chatter, he would be able to perform under those circumstances . The same limitation with regard to supervisors. Regarding response -- responding appropriately to either a usual work situation, or changes in a routine work setting, I'm going

to give you a couple of examples. Let's say that he's working at a work station/ and for some reason -- now, we're talking about changes in the routine work setting. Let's say that, for some reason, he couldn't work at his work station. He had to be moved to a different work station where he was around people he was unfamiliar with, regardless of the distance where he would be he would be expected to work there. He would have hesitation because he wouldn't know where the materials are, he wouldn't know where the supplies were, he would be ruminating about how comfortable he was back in his other spot. It would take him five minutes or so to adjust to that change. Where another person would be able to immediately just begin work, he might stop -- not might. He would stop, he would have to assess the situation very quietly; but after a five-minute initial start, he would be okay, capable of functioning. Or, let's say that he was working in a box, and he had to put things in a box, and the items in the box changed, or the packing material in the box changed. It would cost him five minutes. He would stop, and he'd have to think about it, take a deep breath, relax; but then, he would be okay. Or, say he had to walk down the hall, and turn to the right, and deposit whatever it is he's working on, but now, the change is, he has to walk down to the hall, turn to the left. That would cause him some hesitation. He might proceed down -- he would proceed down the hall slowly, he would think about it as he goes down the hall, so that he would not be able to move at the same rapid pace. He would hesitate as he attempted to -- you know, that kind of thing. Or, where he had a major change. Let's say he has to work with piecework, and he's given new equipment to use. He would look at the equipment, and have to look at all the equipment, and focus on the equipment, take a deep breath. But that wouldn't take him more than five minutes; and then, he'd be okay.

A You said, more than five minutes?

Q More -- it would be about -- no, it would be five minutes; and then, he would be okay. Whereas another person would just look at it, and start it, and get it done.

(Tr. 453-56)

This case is analogous to *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007), where the ALJ determined that the claimant could perform unskilled or semiskilled work and that, because of her depression and anxiety, "should have only superficial incidental contact with the public and co-workers, experience few changes in work setting, and perform only simple, routine, repetitive tasks involving no more than limited decision making."  It was argued on appeal that "in the absence of any medical opinion by [the claimant's treating sources] directly addressing how her depression and anxiety affect her ability to work . . . the ALJ's RFC determination amounted to no more than a 'layman's guess' at the work-related restrictions . . .." *Id.* The Court of Appeals found no merit to this argument, stating:

> Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace. *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001) (citing *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000)). Accordingly, the regulations provide that treating physicians or psychologists will be recontacted by the Commissioner when the medical evidence received from them is inadequate to determine a claimant's disability. 20 C.F.R. § 416.912(e). Nevertheless, in evaluating a claimant's RFC, an ALJ is not limited to considering medical evidence exclusively. *Lauer*, 245 F.3d at 704; *Dykes v. Apfel*, 223 F.3d 865, 866 (8th Cir. 2000) (per curiam) ("To the extent [claimant] is arguing that residual functional capacity may be proved only by medical evidence, we disagree."). Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006).

The ALJ's RFC determination with respect to the work-related effects of Cox's depression and anxiety was sufficiently supported by the medical evidence. The ALJ considered Dr. Al-Taher's examination in which Dr. Al-Taher assessed only a mild depressive disorder. Dr. Al-Taher indicated that Cox's depression was largely due to her chaotic lifestyle and family-life. The record also indicates that Dr. Al-Taher assigned Cox a Global Assessment of Functioning (GAF) score of sixty-five, which indicates that even though she suffers from some mild

symptoms such as depressed mood and mild insomnia, or experiences some difficulty in social or occupational functioning, she generally functions reasonably well and is capable of having meaningful interpersonal relationships. *DMS-IV* at 34. Furthermore, although Cox reported intermittent depressive symptoms (usually spurred by a family crisis), Dr. Al-Taher stated that they "partially improved fairly quickly." Despite Cox's ability to show some partial recovery from depressive episodes, Dr. Al-Taher acknowledged that some socially avoidant symptoms remain. Finally, the ALJ found to be significant Dr. Al-Taher's observation that during her treatment, Cox was capable of superficial social contact as evidenced by her ability to go Christmas shopping at a shopping mall for a five-hour period without difficulty despite her alleged inability to be around others and her proclivity to experience panic attacks. In light of these facts, observations, and medical conclusions which bear directly on the extent of Cox's ability to function in a work environment, Dr. Al-Taher's records persuade us that the ALJ's RFC assessment is supported by substantial medical evidence.

*Id.* at 619-20 (footnotes omitted).

In the present case, Plaintiff did not receive treatment from an acceptable medical source (*i.e.*, a "treating source"), but the ALJ relied upon Mr. Russell's progress notes and the testimony of Plaintiff's aunt to find that Plaintiff's RFC was significantly more limited than had been assessed by the state agency consulting psychologist.[16]  Without repeating the statement of facts, I find that the ALJ's RFC determination is supported by substantial evidence on the record as a whole.

---

[16] "The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." *Shontos*, 328 F.3d at 427 (citing *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir.1999)). "Likewise, the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits." *Id.* (quoting *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000)).

### D.  Step Five Determination

Because the ALJ found at step four of the sequential evaluation process that Plaintiff could not perform any past relevant work (Tr. 27), the burden shifted to the Commissioner to show that Plaintiff could perform other work existing in significant numbers.  *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  "Ordinarily, the Commissioner can rely on the testimony of a [vocational expert (VE)] to satisfy its burden of showing that the claimant can perform other work.  *Robson v. Astrue,* 526 F.3d 389, 392 (8th Cir. 2008).  However, "[t]estimony from a vocational expert is substantial evidence only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies."  *Id.* (quoting *Cox*, 495 F.3d at 620).  A vocational expert's opinion is relevant "only if the ALJ accurately characterizes a claimant's medical conditions in the hypothetical questions posed to the VE."  *Howe v. Astrue*, 499 F.3d 835, 842 (8th Cir. 2007) (citing *Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994)).

As discussed in the preceding section, the ALJ provided the vocational expert with a lengthy hypothetical question that included many "concrete consequences" of Plaintiff's anxiety and panic disorder in a workplace setting.  The vocational expert responded with examples of both light and sedentary jobs that Plaintiff could perform despite his physical and mental limitations.  Because the hypothetical question was consistent with the RFC assessment, the vocational expert's testimony fully supports the ALJ's finding that Plaintiff is not disabled

### III. Conclusion

Accordingly, I conclude that the ALJ's decision is supported by substantial evidence on the record as a whole and is not contrary to law.

IT IS ORDERED that the decision of the Commissioner is affirmed pursuant to sentence four of 42 U.S.C. § 405(g).  Final judgment will be entered by separate document.

September 29, 2011.                    BY THE COURT:

                                       *Richard G. Kopf*
                                       United States District Judge

---

\*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.